**IRVING TRUST COMPANY and Fidelity and Deposit Company of Maryland, Plaintiffs,**

v.

**NATIONWIDE LEISURE CORPORATION, et al., Defendants.**

No. 79 Civ. 261 (WCC).

United States District Court, S.D. New York.

Nov. 24, 1982.

See also, D.C., 95 F.R.D. 51.

Thomas A. Dickerson, New York City, for class defendant and cross claimant Klakis.

George Berkowitz, P.C., New York City, for defendant Capitol Intern. Airway, Inc.

## OPINION AND ORDER

CONNER, District Judge:

Capitol International Airways, Inc. ("Capitol") has filed objections before this Court to one portion of the September 13, 1982 Recommended Decision of Magistrate Kent Sinclair, Jr. In that opinion, Magistrate Sinclair concluded, *inter alia,* that Capitol should not be held in default for its failure to answer the cross-claims asserted against it by the Klakis class but directed Capitol, on pain of sanctions, to respond to outstanding discovery requests. This portion of the Magistrate's Recommended Decision is before the Court for a *de novo* determination pursuant to 28 U.S.C. § 636(b)(1). Upon a review of the record before the Magistrate and the papers submitted by the parties before this Court, I have determined to adopt the Recommended Decision of Magistrate Sinclair for the reasons set forth in his opinion, familiarity with which is presumed.[1]

Capitol has asserted both before the Magistrate and this Court that it is not a party to this interpleader proceeding and that there is no *in personam* jurisdiction over it by virtue of the Klakis cross-claims.

As noted by Magistrate Sinclair, however, Capitol was made a party to this action in 1979 by service of an interpleader complaint by plaintiff Irving Trust Company. The cross-claims were served thereafter by mail on Capitol's counsel pursuant to Rule 5, F.R.Civ.P. Although Capitol did not answer the complaint, it participated in the action by opposing Irving's motion for summary judgment and the motion for class certification, and by submitting papers attacking the legal sufficiency of the classes' cross-claims.

Capitol now argues for the first time that because it has settled its disputes with the interpleader plaintiff Irving, there was no valid service of the cross-claims against it. The logic of this argument is somewhat difficult to comprehend. The cross-claims were served upon Capitol through its attorney in July of 1980. Capitol settled with Irving in February of 1982. Clearly, at the time Capitol was served with the cross-claims it was a party to this action and the subsequent resolution of the initial claim cannot render those claims invalid for lack of personal jurisdiction. Nor is this Court, any more than Magistrate Sinclair, impressed by Capitol's repeated denials of party status made in each of Capitol's many submissions on the merits of this case. The fact remains that Capitol "has acted like a party on each occasion that it was strategically useful to act like a party and it has never sought to be dismissed as a party," Recommended Decision, slip op. at 7, until the instant motion.

Capitol's remaining objections were presented to the Magistrate and the Court is in full agreement with the rejection of those contentions. With respect to Capitol's alternative request that this Court stay the cross-claims against it in view of the "pending" State Supreme Court action, that request is denied since there is apparently no action being taken in that case pending the outcome of the instant litigation. Ac-

---

1. My adoption also includes the remainder of the Magistrate's Recommended Decision as to    which no objections were raised.

cordingly, Capitol is ordered to respond to all outstanding requests within thirty (30) days of this Opinion and Order.

SO ORDERED.

## APPENDIX

## RECOMMENDED DECISIONS ON MOTIONS BY CLASS CLAIMANTS

SINCLAIR, Magistrate:

After decisions of this court which recommended class certification and dismissal of an affirmative defense were adopted by Judge Conner, the classes herein moved on June 18, 1982,

A. For an Order rendering a default judgment against Capitol International Airways, Inc. for its failure and refusal to answer or respond to the cross claims asserted against it by the class of defendants set forth in the Answer, Class Claims and Class Cross Claims of Marion Klakis and Carol Barnes; said judgment to be in the amount of $300,-000 actual damages together with $3,000,000 punitive damages;

B. For an Order granting summary judgment on behalf of the individual class defendants [Mr. & Mrs. Samuel Reiken, Mr. & Mrs. Klakis, Mr. & Mrs. Barnes, Mr. & Mrs. Dupack, Dr. Low, Gloria Goodman, Myra Eichenbaum, Myra and Arlene Richman] and the classes they represent [Reiken, Low, Dupack and Klakis classes] dismissing as a matter of law the "Second Defense Against the Bond [Or Rider] Claimants" of the plaintiff, Fidelity and Deposit Company of Maryland as set forth in the Amended Complaint In The Nature Of Interpleader;

C. For an Order granting summary judgment on behalf of those persons identified in sub-paragraph "B" above dismissing as a matter of law the following enumerated Affirmative De-

fenses set forth by defendants Nationwide Leisure Corporation, Joel Nadel and Stuart Graff in their Answers to various cross claims;

1] The Fifth and Twelfth Affirmative Defenses in the Answer to the Klakis Cross Claims;

2] The Fifth and Ninth Affirmative Defenses in the Answer to the Low Cross Claims;

3] The Fifth and Ninth Affirmative Defenses in the Answer to the Dupack Cross Claims;

4] The Fifth and Ninth Affirmative Defenses in the Answer to the Reiken Cross Claims;

5] The Seventh Defense in the Answer to the Eichenbaum and Goodman Cross Claims;

6] The Seventh Defense in the Answer to the Richman Cross Claims;

Notice of Motion, dated June 16, 1982. Briefing was completed on August 13, 1982. For the reasons that follow in Part A, the classes' motion with respect to Capitol must be DENIED, with a caveat. For the reasons that follow in Part B, the classes' motion with respect to Fidelity must be GRANTED. For the reasons that follow in Part C, the classes' motion with respect to Nationwide, Graff and Nadel must be granted in part and denied in part. Familiarity with the extensive prior opinions and decisions in this matter is presumed. *See especially* as to Part A, *Wasserman v. Fidelity & Deposit Company of Maryland,* 490 F.Supp. 564 (S.D.N.Y.1979); Judge Conner's Opinion and Order dated July 2, 1980, *reprinted* at 16 Aviation Cases 18,396; as to Parts B and C, *see* March 12, 1982 Recommended Decision reported at 34 F.Rules Serv.2d 66 (1982); December 7, 1981 Recommended Decision reported at 93 F.R.D. 102 and 34 F.Rules Serv. 148 (1981); Judge Conner's decision dated June 1, 1982 reported at 17 Aviation Cases 17,136.[1]

---

1. As discussed in prior decisions of this court, participation by these parties in this interpleader cum class action has provided them an opportunity to litigate one lawsuit instead of nearly a dozen in several different fora. Inter-

pleader is not a bill of peace, *see State Farm v. Tashire,* 386 U.S. 523, 87 S.Ct. 1199, 18 L.Ed.2d 270 (1967), but the nature of the claims of the initial interpleader defendants, *see* Omnibus Brief of Nationwide, has permitted this court to

### A. *Classes' Motion to Hold Capitol in Default.*

This motion was precipitated by Capitol's refusal to respond to discovery requests on the asserted ground that it is not a party to this lawsuit. The classes' motion, though denominated a motion for default, is aimed merely at securing a judicial declaration that Capitol and the cross-claims against it are properly before the court, so that Capitol may not decline to respond to proper discovery requests. Some background will help to place this peculiar situation in context.

Capitol is an air carrier which contracted to provide air transportation in connection with some Nationwide charter tours. When Nationwide passed Capitol some rubber checks in purported payment for these services, Capitol looked to interpleading plaintiff Irving Trust Company, the depository bank, for payment. When Irving declined payment, Capitol sued Nationwide in state court.

Shortly thereafter, Irving instigated this interpleader action and served Capitol at its New York offices, which service was accepted by Capitol. *See* Grashof Affidavit of July 19, 1979. Capitol coyly declined to answer the interpleader complaint, but began to participate in the interpleader action. Initially, its participation took the form of opposing an injunction staying its state court action against Irving[2] and opposing a summary judgment motion brought by Irving.

During this period, the classes herein were suing the interpleader plaintiffs, Capitol, Nationwide, Graff and Nadel in state court. When those state actions were stayed and removed to federal court and the class representatives named as parties herein, some of the classes sought and were granted certification under Rule 23. Capitol, which had never asked to be dismissed as a party, continued to participate in this lawsuit, appeared at conferences, and submitted papers opposing certification of the classes and attacking the legal sufficiency of the classes' cross-claims.[3] *See* Affidavits in Opposition of George Berkowitz and Thomas F. Ahern, dated August 19, 1980.

Capitol seeks to avoid the entry of default and to excuse its refusals to provide discovery principally on the grounds that it is not a party because the court has no personal jurisdiction over it. Capitol's Memorandum of Law ("Capitol Mem.") at Points I[4] and II. This contention is discussed below. Capitol's other arguments amount to a denial that the cross-claim has merit and an expression of fear that the court is permitting litigation of sham claims.[5] No proper summary judgment mo-

---

carry out its equitable duty to guard a limited fund and permit proper Rule 23 certification without adding new issues in any untoward degree. *And see, CAB v. Tour Travel Enterprises,* 605 F.2d 998, 999 & n. 1, 1003–05 (7th Cir.1979).

**2.** Initially, Judge Conner held that Capitol must, in part at least, sue Irving here. *See Wasserman, supra.* Then, after Capitol disclaimed any interest in the interpleaded funds, Judge Conner permitted it to proceed against Irving in state court.

**3.** Pursuant to Rule 5, F.R.Civ.P., the classes properly served answers containing the cross-claims on Capitol by mail. *See, id.* (pleadings after initial complaint may be served by mail). Only one class, Klakis and Barnes, named Capitol as a cross-claim third-party defendant.

**4.** Nowhere does Capitol argue that the court lacks subject matter jurisdiction over the cross-claim, but Point I of the Capitol Mem., liberally

construed, raises the question. The court is satisfied that subject matter jurisdiction may be asserted over the cross-claim against Capitol and, under the circumstances, it is sound exercise of discretion to assert subject matter jurisdiction here. *See, e.g.,* Memorandum Opinion on Class Certification Matters, *supra,* 93 F.R.D. at 111; 3 Moore's Federal Practice ¶¶ 13.36, 13.39 and 3A Moore's Federal Practice ¶ 22.15 (2d ed. 1980); *Compare Bache v. Roland,* 375 F.Supp. 989, 990–91 (S.D.N.Y.1974) (noting authority to assert jurisdiction, but declining to do so because no fairness or economy would result). Failure to assert jurisdiction here would result in unnecessary multiplication of proceedings and monumental wasted effort. *See Leather's Best, Inc. v. S.S. Mormaclynx,* 451 F.2d 800, 809–10 (2d Cir.1971).

**5.** *See, e.g.,* Affidavit of Thomas A. Ahern, dated July 29, 1982 at ¶ 34 ("... when I was a young man, I was a sergeant in the U.S. Army. As a loyal and native born American, I am proud of

tion is yet before the court and, hence, these fears cannot warrant dismissal of the cross-claims now.[6] The only argument which requires extended discussion is made in Points I and II of Capitol's Memorandum to the effect that Capitol is not a party for lack of personal jurisdiction.

This argument must be rejected. Capitol was made a party to this lawsuit and never challenged service, it has acted like a party on each occasion that it was strategically useful to act like a party and it has never sought to be dismissed as a party. Its refusals to answer the interpleader complaint or the cross-claim and the boilerplate denials of party status which it has included in each of the *many* filings it has made in this action are recognizable for what they are: elements of a transparent smokescreen behind which Capitol conducts itself as a party and attempts to suspend the Klakis claim against it in limbo between federal and state court.

The only support provided by Capitol for its untenable position is a sentence torn out of the context of Judge Conner's July 2, 1982 Opinion. The full sentence (including the introductory phrase left out by Capitol) reads as follows: "*Unlike the situation involving cross-claims between defendants,* this court has no *personal jurisdiction* over third-party defendants who are not claimants to this interpleader suit unless such jurisdiction is established consistent with the rules governing the assertion of *in personam* jurisdiction over non-residents under the due process clause and applicable state statutes." *Id.* at 15–16 (emphasis added). Even assuming the first eight words of this sentence do not obliterate any proper reliance on this sentence by Capitol, the rest of the sentence has no application to it in any event. It appears that Judge Conner was simply making the point earlier made in *Wasserman:* the court is alert to the need to protect persons not amenable to service within the forum state from possible abuse of the nationwide service feature in statutory interpleader. *See* 3A Moore's, *supra,* at ¶ 2215; *Gaines v. Sunray Oil Company,* 539 F.2d 1136, 1141–42 (8th Cir.1976) (discussed in *Wasserman*); *Dean Witter Reynolds v. Fernandez,* 489 F.Supp. 434, 441–42 (S.D.Fla.1979). Capitol, of course, was and is amenable to service in New York, where it has offices, does business and conducts litigation in state court. Moreover, the above doctrine applies only to parties who default without appearing or are dismissed, *see Gaines, supra.* Capitol is in neither category.

In conclusion, while the context and motion here, *see* Point 6 of Capitol Mem.,[7] do not justify a default judgment, Capitol is directed, under pain of sanctions, to respond to the outstanding discovery requests within thirty (30) days.

**B.** *Motion to Dismiss Fidelity's Second Defense.*[8]

As Fidelity correctly notes, "The issue with which this court is [here] faced is

---

and have great respect for our courts and judicial system, and it is shocking that a U.S. Court would permit its facilities to be used in a sham and vexatious and fictitious claim . . .").

**6.** The court, on the present record (several inches of documents submitted on this motion by Capitol and on previous motions by the Klakis Class) shares Capitol's puzzlement as to why it is named in the cross-claim and has looked in vain for merit in the cross-claim against Capitol. But a more systematic presentation, as noted by the state court in denying a similar motion by Capitol to dismiss, will be needed to trigger dismissal or summary judgment. At present there remain disputed factual issues. Further, 28 U.S.C. § 1927 is available, in a proper case, to halt and cure vexatious litigation.

**7.** The classes sometimes vigorously present their position, but sometimes rely on the court to do their research. *Cf. Cornell v. Dickerson,* 100 Misc.2d 198, 418 N.Y.S.2d 977 (Sup.Ct. 1979).

**8.** The Second Defense is this:

AS AND FOR A SECOND DEFENSE AGAINST THE BOND OR RIDER CLAIMANTS

45. Upon information and belief, some of the claims asserted against the Bond or Rider are not within the coverage afforded by said Bond or Rider.

46. As to those claimants whose claims are not within the coverage afforded by said Bond or Rider, Fidelity challenges such claims and denies liability therefor under its Bond or Rider.

whether the surety bond issued by Fidelity covers the claims asserted by each of the moving parties and the classes they represent." Memorandum of Fidelity and Deposit Company of Maryland..., ("Fidelity Mem.") at p. 2. Prior to discussing the merits of the motion, which clearly must be granted, a preliminary word is in order.

Fidelity's position on this motion is a complete reversal[9] of a position it has taken in this lawsuit up until now on the issue of tour participant contract construction. In objecting before Judge Conner concerning my March 12, 1982 Recommended Decision, Fidelity took this position on the issue of tour participant contract interpretation: "it is clear that the tour participant contract permitted refunds not only for cancellations but for changes of itinerary as well." Fidelity's Objections of April 16, 1982. In total contrast is the position taken by Fidelity in opposition to the present motion: "Nationwide ... provided [in its tour participant contracts] that refunds would not be given for itinerary changes." Fidelity Mem. at 5.[10]

Moving to the merits of the present motion against Fidelity, the only question to be decided here is a legal one: does the bond, relevant portions of which were drafted by the Civil Aeronautics Board ("CAB"), and which was issued pursuant to part 378a of the CAB's Special Regulations, cover claims for itinerary[11] changes. In support of its assertion that the bond does not cover claims based on itinerary changes, Fidelity offers a discussion of some regulatory history called to its attention by the court in the March 12, 1982 Recommended Decision. Thus, the sole authority upon which Fidelity here relies is authority with which the court is well familiar and upon which the court relied, in part, to conclude in the March 12, 1982 Recommended Decision that the bonds issued by Fidelity cover claims based on itinerary changes. This authority will be discussed after prior relevant authority is reviewed.

The CAB regulations governing the Bond were, as previously discussed, promulgated pursuant to authority delegated to the CAB:

Amended Complaint at ¶¶ 45–46.

**9.** Of concern here is not the situation where a position is changed when new evidence or circumstances are presented and the change of position is identified as such. *Compare* Recommended Decision of December 30, 1980 with Memorandum Opinion reported at 93 F.R.D. 102. Rather, the concern is with the practice of reversing positions previously taken without explanation or acknowledgment. The classes and Nationwide, Graff and Nadel also do this sometimes, but Fidelity is wrong in accusing the classes of a reversal in that they now argue that the tour participant agreements did not require notice of itinerary change claims. The previous position of the classes was that their *representatives* knew of the Bond and believed it should cover itinerary change claims. And, indeed, consistent with this belief, the representatives gave notice within sixty days. Also, the belief came from the reading of the *brochures,* not the tour participant agreement, *see* Fidelity's April 16, 1982 Objections at 28.

**10.** *See also, id.* at 4 ("... Nationwide's policy was that no refunds would be given for itinerary changes under any circumstances"). Similarly, Fidelity is apt to raise new issues before Judge Conner that were not raised before me. For instance, Fidelity argued to Judge Conner that third party beneficiary analysis applies to the issues of the validity of the sixty

day notice provision in the CAB regulations, Bond and contracts. This argument was not made before me. *See* March 12, 1982 Recommended Decision at p. 17, n. 11. It is obviously inapplicable, however. Third party beneficiaries' rights often "vest" when they learn of such rights. So if third party beneficiary analysis applied, tour operators and bonding companies could render the bonding scheme intended for the protection of tour participants nugatory by simply avoiding the giving of notice to such persons of their rights. It is therefore the rule that the rights of beneficiaries under statutory bonds are "sui generis" and must be analyzed in light of the statute creating them. *See id.; Free v. Bland,* 369 U.S. 663, 82 S.Ct. 1089, 8 L.Ed.2d 180 (1962) (where conflict between state law and federal regulations creating bond rights, follow latter).

**11.** "'Itinerary' means all the components of a tour package, as described in the tour prospectus, including not only the points named therein but also all hotels, and other ground accommodations and services described therein." 14 C.F.R. 378a.2. Herein, the only itinerary changes at issue are hotel changes. Typically, tour participants were promised accommodations in specified hotels or "similar". The classes allege that they did not receive the promised accommodations.

Congress' broad purpose in delegating to the CAB authority to regulate various recognized forms of travel and charter tours was to serve the public interest in low cost travel. *Transworld Airlines, Inc. v. C.A.B.,* 545 F.2d 771, 775 (2d Cir.1976); *Pan American World Airways v. C.A.B.,* 517 F.2d 734, 746 (2d Cir.1975). Congress specifically intended that the CAB attempt to realize this purpose by, inter alia, making the provision of charter and travel tours financially rewarding to the providers, *see, e.g.,* H.R. No. 1639, 90th Cong. 2d Session (1968), and protecting tour and charter participants from overreaching business practices, *see, e.g., id.*

Congress' intent that the CAB's rules governing tours and charters protect travelers and tour participants was made very clear. Title 49 U.S.C. § 1371 (h)(2) (1962) gave the board authority to require any charterer or tour operator, including one stop inclusive tour operators like Nationwide, to file a "performance" bond [13] to protect travelers in the event of the tour operator's failure to supply promised services.[14] The legislative history of this provision demonstrates that by giving the CAB this rulemaking authority Congress intended to insure the carrier's financial responsibility and supply some recourse to those who would be otherwise helpless. *Bratton v. Shiffrin,* 635 F.2d 1228, 1231 (7th Cir.), *cert. denied,* 449 U.S. 1123, 101 S.Ct. 939, 67 L.Ed.2d 109 (1981).

[13] Although denominated a "performance" bond, it appears that a payment bond was contemplated, since the former undertaking includes an obligation to complete performance, an obligation clearly inapposite to the role played by the Bond in the statutory and regulatory scheme.

[14] Section 1371 was amended in 1978, with the result that, *inter alia,* the provision regarding bond coverage was renumbered as § 1371(q)(2).

March 12, 1982 Recommended Decision at pp. 18–19.

In 1965 and 1966, when the CAB instituted the charter tour concept on a broad scale and set up regulations governing the provision of charter tours, it followed the congressional mandate and imposed a bonding requirement. In doing so, the CAB discussed the purpose of the bonding requirement: CAB regulations permitted tour operators to enter the field with minimal capitalization, so that any unexpected cash flow droughts could send some operators out of business or prevent performance of a tour and leave tour participants whose tours were not performed as offered helpless and without recourse. *See generally, Supplemental Air Service Proceedings,* 45 C.A.B. Reports 231–424 (1966) and 46 C.A.B. Reports 396–406 (1966); Notice of Proposed Rulemaking, 30 Fed.Reg. 281, 282 (1965) (bond is to "insure the financial responsibility of the tour operator to the traveling public"). *See also* Notice of Proposed Rulemaking, 32 Fed.Reg. 13009 (1967) (bond covers claims based on "failure to provide the services for which the tour price has been paid"); Modification of Surety Bond Requirements, 36 Fed.Reg. 6586 (1971) (bond to "provide better protection to the public from defalcations by tour operators *or* breach of contract between the tour operator and tour participant"); Supplemental Air Service Proceeding, 44 C.A.B. Reports 396, 401 & n. 17 (1965) ("The bonding requirements imposed by our regulations are such as to insure that the tour price will be refunded to the purchasers in the event of non-performance"). Subsequently, the CAB expressly recognized that the bond furnished protection to tour participants against unscrupulous tour operators like Nationwide. *See, infra,* at p. 967.

Part 378a of the CAB's special regulations governed the bonds at issue here. Appendix A to that part contained a prescribed form for the bonds. By their terms, the bonds provided coverage for claims based on the tour operator's

"failure faithfully to perform, fulfill, and carry out all contracts, agreements, and arrangements made by the [tour operator] while this bond is in effect with respect to the receipt of monies from tour participants and proper disbursement thereof pursuant to and in accordance

with the provisions of Part 378a of the Board's special regulations."

74 C.F.R. 378a, Appendix A.

Whereas prior to 1976 the concern of CAB rulemakers was seldom specifically focused on consumer protection matters, the practices of Nationwide and other operators, who were described by the CAB as "unscrupulous ... persistent ... malfeasors ... [who] ... abuse the public",[12] forced the CAB to focus on consumer protection rules during a lengthy rulemaking proceeding that stretched from 1976 to 1979, blanketing the relevant period in this lawsuit. During this proceeding, the bond language quoted above and contained in the bonds at issue here was construed by the CAB and found to provide "unquestionable protection" for hotel changes. 44 Fed.Reg. 44,150–51. By this time, the rules governing the content of tour participant contracts *required* operators to give refunds for hotel switches, but prescribed bond language remained the same, and the CAB had earlier expressed the view that such refunds were "already available to participants at common law" and that rules modifying the tour participant agreement were merely to accomplish the "practical" result of making it "(1) more likely that participants could assert their refund rights on the spot ... and (2) easier for them to pursue these rights later in Small Claims Court, if necessary, without having to hire a lawyer." Consumer Protection for Charter Participants, *supra*, 43 Fed.Reg. at 39810; March 12, 1982 Recommended Decision at n. 19.

Fidelity fails to dispute any of this, contenting itself with echoing observations made by the court in the March 12, 1982 Recommended Decision[13] and making the following argument: the bonds cover only breach of contract claims, and Nationwide's tour participant agreements could, and did, consistent with existing regulations, eliminate any refunds for itinerary changes, including hotel substitutions. Thus, Fidelity argues, since the tour participant contracts did not provide for refunds for itinerary changes like hotel substitutions, the bonds do not cover these kinds of claims.

This argument is without merit. First, as the discussion above shows, it is simply wrong to say that the bond covers only breach of contract claims. It covers, besides breach of contract claims, any claim arising out of a tour operator's failure "faithfully" to perform or his handling of funds in any way inconsistent with the governing regulations or the common law, including liabilities sought to be established on theories such as fraud/misrepresentation,[14] breach of federal regulations,[15] or non-performance due to negligence.[16]

Second, Nationwide's contracts did not disclaim *liability* for itinerary changes such as hotel substitutions. Surely, Nationwide purported ineffectively to disclaim "refund rights" for itinerary changes, but "refund"

---

**12.** Consumer Protection for Charter Participants, 43 Fed.Reg. 39807 (1978).

**13.** *Compare* Fidelity Mem. at 4–5, 9–11 with March 12, 1982 Recommended Decision at pp. 30–31 and nn. 18 & 19. Despite vast experience with the federal regulations at issue here (accumulated through numerous state litigations involving Fidelity and its attorneys), Fidelity first took the position that the regulations were irrelevant, *see* Recommended Decision of March 12, 1982, at 15, and continues to appear unwilling to research the regulations at issue here: Fidelity simply waits for the court to locate pertinent regulatory history and has not discussed a single portion of regulatory history which was not previously discussed by the court or the classes. This is a significant failing, given the beehive of bureaucratic and administrative activity involved: 14 C.F.R. Parts 378 and 378a were subjected to over fifty changes and proposed changes between 1965–1978. The other parties have also been of little help in this regard. The classes presented research into the regulatory history only once, Nationwide not at all. Even the CAB has been unwilling to research its own regulations.

**14.** *E.g.*, 36 Fed.Reg., *supra*, 6586 ("defalcations" by tour operators).

**15.** *See, Bratton v. Shiffrin*, 635 F.2d 1228 (7th Cir.), *cert. denied*, 449 U.S. 1123, 101 S.Ct. 939, 67 L.Ed.2d 109 (1981) (recognizing private right of action as implied by statute authorizing Part 378a bond).

**16.** Regulations prevented waiver by tour operator of negligence liability. Federal case law is to the same effect. *See, infra*, at p. 971.

and "liability" are not the same. "Refund" rights are simply regulatory remedies, mechanisms designed to make it faster and easier for tour participants to enforce legal rights created by common law, rule and statute.[17] "Refund" rights are in action to, not in place of, the traditional common law rights.[18] It was up to the tour operators, *at their own risk,* to establish refund policies, *subject to the mandated responsibility* clause and with liability determinations left to the courts. March 12, 1982 Recommended Decision at 30–31; Inclusive Tours by Supplemental Carriers, *supra,* 37 Fed. Reg. 22851, 22852–3 (1977); Interpretation of Regulations Concerning Surety Bonds, *supra,* 44 Fed.Reg. 44149, 44150 (1979) (after "Nationwide Leisure Corporation" was "sued for improper hotel substitutions . . . the Board [did not] examine the nature or plausibility of the claims").

Third, assuming that the tour contracts were intended to disclaim any responsibility to perform, they failed to achieve that result, and any provisions sought by Fidelity to be so construed are nullities, in flat contradiction of the responsibility clause required to be in tour participant contracts. *See* 14 C.F.R. 378a(30)(i) (tour operator "is responsible to the participants in making arrangements for *all* services and accommodations offered in connection with the tour"). To adopt the argument put forward by Fidelity would require a holding that Nationwide had no obligation to perform the contracts (by providing the promised tours) that Fidelity argues to be valid and enforceable. Obviously, if Nationwide had no obligation to perform under the contracts they would not be contracts at all, but illusory agreements unenforceable for lack of consideration.[19] To construe CAB regulations promulgated for the protection of tour participants to permit tour operators to accept payment for non-performance would be utterly illogical, and no reasonable interpretation of those regulations can be made that will support Fidelity's position. *See* 32 Fed.Reg., *supra,* at 13009 (bond covers claims based on "failure to provide the services for which tour price paid"). It simply cannot seriously be argued that the CAB gave tour operators a license to steal.

In conclusion, the bond clearly covers hotel switching claims and other itinerary change claims.[20] In this, the court is in apparent agreement with two New York decisions. *See Dupack v. Nationwide Leisure Corp.,* 73 A.D.2d 903, 424 N.Y.S.2d 436 (1980)[21] and *Berger v. Nationwide Leisure,* No. 22025/77 (N.Y.Sup.Ct., August 25, 1978) (squarely holding that hotel switching claims are covered).[22] The bonds at issue cover the claims of the classes, whether

---

17. Consumer Protection For Charter Participants, *supra,* 43 Fed.Reg. at 3810.

18. *Id.;* 49 U.S.C. § 1506; *Nader v. Allegheny Airlines,* 426 U.S. 290, 298–299, 307 & n. 18, 96 S.Ct. 1978, 1984–1985, 1988 & n. 18, 48 L.Ed.2d 643 (1976).

19. By Fidelity's reasoning, the only obligation Nationwide would have had under the contracts would be to use its "best efforts" to perform. The regulatory scheme precludes such a construction. Moreover, while in some circumstances such a "best efforts" obligation might technically qualify as consideration, I find as a fact, on the basis of the numerous exhibits submitted prior to and in connection with this speaking motion, that the classes' bargained-for-exchange here included the services and accommodations offered in connection with the tour. It would appear that the "offer" here was the brochure, and that inconsistencies in the tour participant agreement would be nullities or unaccepted counter-offers. *Compare,* 43 Fed.Reg., *supra,* at p. 39,811 (theorizing that the tour participant agreement constitutes an offer by the tour participant, such theorizing being entitled to little or no weight since it is not an interpretation of a rule). *Cf.,* UCC 2–207.

20. Contrary to Fidelity's mischaracterization, the Klakis claim is for non-delivery, not flight delay.

21. In this case, the court appeared to hold that itinerary changes are covered by the bonds but that claims based on quality of service and dissatisfaction are not.

22. The attorneys for Fidelity appear to be representing a party in this case; certainly they know this decision. Yet Fidelity has not mentioned or discussed this decision in its opposition to this motion. *Cf.,* The Lawyer's Code of Professional Responsibility, Ethical Consideration 7–23 and Disciplinary Rule 7–106(B)(1).

denominated as breach of contract, (the only claim discussed by Fidelity), negligence, fraud or breach of federal regulations. Hence, Fidelity's Second Defense must be stricken as a matter of law.

## C. The Classes' Motion Against Nationwide, Graff and Nadel.

The classes here seek judgment dismissing two defenses asserted by Nationwide and its principals, Joel Nadel and Stuart Graff. These two defenses are given various designations in the various answers of these defendants to the classes' cross-claims, see, supra, at p. 961, but in substance they are (1) that Graff and Nadel are not personally liable for the acts of Nationwide, and (2) that the tour participants' contracts contained disclaimers of liability sufficient against the class-cross claims herein. The motion as to (1) must clearly be DENIED on the present record, and the motion as to (2) must be GRANTED.

### 1. Personal Liability of Graff and Nadel.

In effect, the classes seek an alter ego declaration or a piercing of the corporate veil. But while the privilege of doing business as a corporation has its limits, the factual record here is entirely undeveloped and no sufficient facts are presently before the court that would support a finding in the classes favor.[23] Accordingly, this aspect of the motion must be DENIED.

### 2. The Disclaimer Defense.

This aspect of the motion seeks to dismiss any disclaimer defenses as insufficient as a matter of law as against the classes' cross-claims. There is overlap here with the motion to dismiss Fidelity's defense of non-coverage, and this overlap is highlighted by Nationwide's request that the court consider Fidelity's submissions in connection with the motion to dismiss the disclaimer defense. See Nationwide Mem. at 3 & n.[24] Since the classes' claims involve only itinerary changes, the motion is construed as seeking dismissal of the defense as against contract claims based on itinerary changes.[25]

Preliminary, it does not appear that the contracts purport to disclaim liability; rather, it appears that the contracts merely disclaim refund rights, leaving open to participants their recourse to establish liability in a court of law. See, supra, at pp. 967–968. Assuming for argument's sake that the contracts do purport to disclaim liability for itinerary changes, they failed, as a matter of law, to achieve that result, for the reasons that follow.

An interesting threshold issue (and one that, true to form, none of the parties have mentioned, discussed, or researched) is the law to be applied in considering the validity of any purported disclaimer in the contracts. It appears that federal law applies,

23. See Walkovszky v. Carlton, 18 N.Y.2d 414, 417, 276 N.Y.S.2d 585, 588, 223 N.E.2d 6, 8 (1966); Mull v. Colt, 31 F.R.D. 154, 162–63 (S.D.N.Y.1962); Establissement Tomis v. Shearson Hayden Stone Inc., 459 F.Supp. 1355, 1365 (S.D.N.Y.1978). This is also true of the fiduciary theory relied on by the classes and accepted in C.A.B. v. Scottish American, 411 F.Supp. 883 (E.D.N.Y.1976).

24. It is obvious that Nationwide and Fidelity are working in tandem on this lawsuit. They ratify and adopt one another's motion papers, see Recommended Decision of March 12, 1982 at n. 8; they lift entire sections out of one another's motion papers (without attribution but obviously with consent), e.g., compare, Memorandum of Law of Nationwide Leisure Corporation, Joel Nadel and Stuart Graff ... ("Nationwide Mem.") at 16 & n. with Memorandum of Fidelity and Deposit Company of

Maryland submitted pursuant to 28 U.S.C. § 636 ... ("Fidelity's Objections") at 17 & n; and they rely on each other to make arguments, see, e.g., Fidelity Mem. at p. 5 & n. There is nothing inherently wrong with this practice, but no point in pretending it is not being done.

25. The court agrees with Nationwide and the CAB that Nationwide did not and could not disclaim liability for its negligence. See Nationwide Mem. at 3–4; Memorandum of the United States in Response to Objections ... to the March 12, 1981 Recommended Decision... ("United States May Mem."), dated May 6, 1982 at 8–11. Nationwide also (wisely) does not attempt to argue that it has disclaimed liability for fraud/misrepresentation or breach of federal regulations.

as opposed to New York law or the law of some other state,[26] to the question of the validity of any purported disclaimers.[27] *See, e.g., McDermott v. Travelers Air Services, Inc.,* 462 F.Supp. 1335, 1340–41 (E.D. P.A.) (holding that construction of contracts regulated by 14 C.F.R. § 378 is a matter of federal law); *Klicker v. Northwest Air Lines,* 563 F.2d 1310, 1316 & n. 10 (9th Cir.1977); *North American Phillips Corp. v. Emery Air Freight,* 579 F.2d 229, 232–34 (2d Cir.1978). This is because application of state law could (depending on the law of a particular state) produce "an irreconcilable conflict between the statutory scheme and the persistence of common law remedies . . ." *Nader, supra,* 426 U.S. at 299, 96 S.Ct. at 1984. *See also, Artvale, Inc. v. Rugby Fabrics Corp.,* 363 F.2d 1002, 1006–07 (2d Cir.1966); *United States v. Taylor,* 333 F.2d 633 (5th Cir.), *opinion adhered to,* 336 F.2d 149 (5th Cir.1964). *Compare United States v. Maryland Casualty Co.,* 384 F.2d 303, 304 & n. 1 (2d Cir.1967).

Nationwide, Graff and Nadel's argument in opposition to the motion is that the CAB, which was itself suing Nationwide, Graff and Nadel over hotel switches from 1974–1977, and which in 1978 characterized these defendants as "unscrupulous . . . malfeasors [who] abuse the public . . .",[28] endorsed and approved Nationwide's policy of disclaiming refund rights and liability[29] for itinerary changes like hotel switches. This argument is presented in two forms.

First, Nationwide, Graff and Nadel make the argument in this form: "The various disclaimers of liability contained in the Nationwide Tour Participant Agreement were permitted and contemplated by the regulations." Nationwide Mem. at 3. In support of this argument, Nationwide proffers some regulatory history and falsely states that such regulatory history (43 Fed.Reg. 39807) "was not previously before the court" Nationwide Mem. at 12. Of course, the court introduced this regulatory history in the March 12, 1982 Recommended Decision,[30] and it does not support Nationwide's argument, which in essence is that it did not have to perform its contracts.[31] The regulations governing Nationwide and its contracts clearly stated that, over and above whatever responsibility Nationwide had under existing common law, its responsibility under the rules in part 378a extended to "all services and accommodations offered in connection with the tour". 378a(30)(i). This language could not be clearer: Nationwide offered to place tour participants in specified hotels or similar ones, and if it did not, it is responsible. Moreover, the CAB clearly demonstrated that, wholly apart from liability disclaimers, Nationwide could not disclaim refund responsibility in ways inconsistent with 378a(30)(i) by suing Nationwide from 1974–1977[32] and getting a judgment binding Nationwide, Graff and Nadel to provide refunds when tour participants were placed in hotels inferior to those offered. *CAB v. Nationwide, Graff and Nadel, et al.,* No. 74 C. 915, Final Judgment and Permanent Injunction, dated August 4,

**26.** The parties appear to assume that federal law applies, but Nationwide cites one New York case.

**27.** It is not necessary now to decide whether state or federal law applies to other issues raised by the contract claims, but the disclaimer issue requires interpretation of a federal regulatory scheme and federal cases relied on here by the authors of the disclaimer. There are elements of pendant jurisdiction in this federal question case which suggest the need for caution in applying the rule that federal law applies in federal question cases.

It should also be borne in mind that the classes seek recovery on three other theories as well. As to these, the breach of federal regulation theory must surely be resolved under federal law, and the negligence and fraud/misrepre-

sentation theories may well be governed by state law. *See Nader v. Allegheny Airlines, supra.*

**28.** Consumer Protection for Charter Participants, *supra,* 43 Fed.Reg. 39807.

**29.** As before stated, it does not appear that the contracts disclaimed liability, and it is only for argument's sake that the case is being presumed.

**30.** *See id.* at p. 31 & n. 19.

**31.** *See, supra,* at pp. 18–19.

**32.** The classes' claims arose in 1977 and January 1978.

1977.[33] This branch of Nationwide's argument is therefore without merit.

The second version of Nationwide, Graff and Nadel's argument that the CAB approved and endorsed Nationwide's hotel switching and disclaimers of refunds and liability rests on the same regulatory history. A portion of this regulatory history recites:

> Under our existing rules, before a charter operator may advertise or sell a charter program to the public, the operator and the direct air carrier involved must first file with the Board a charter prospectus containing a surety bond, charter contract (between the operator and carrier), operator-participant contract, depository agreement (where applicable), and sample solicitation material covering the charter program. *Our staff then has 15 days to review these documents to make sure that they comply with our regulations. If the filing does not comply, the staff rejects it and advertising of the program cannot begin until the necessary changes or corrections are made.* If a prospectus does comply, the charter program may be advertised [for sale to the public].

43 Fed.Reg., *supra*, 39807 (1978) (referring to 14 C.F.R. § 378a.25). Nationwide argues that since it filed its tour materials and no objection was made by the CAB, Nationwide is now immune[34] from a court determination that it violated the pertinent regulations, and the court cannot "impeach", Nationwide Mem. at 3, the terms of the tour participant contracts. Nationwide relies chiefly on cases that arose out of disputes over tariffs filed pursuant to the Federal Aviation Act and CAB regulations other than those applicable here.[35] The tariff filing rules are very different from those here,[36] and, as will be seen, this branch of Nationwide's argument has no merit.

When rules were first developed to introduce the charter concept, there was some debate about how heavy the regulation should be and how close the monitoring should be. There was consideration of whether tours should be expressly "approved", and the CAB's staff felt that it lacked the resources and that the filing period was too short to permit detailed, "approval-type" review of each filing. Accordingly, the first proposed rule for charters utilized a provision in other economic regulations providing for "spot-checks" of filings and formal approval only when an "Advisory Opinion" was requested. Notice of Proposed Rulemaking, 30 Fed.Reg. 281, 285 (1965). The CAB, however, thought that something in between a spot check and a formal prior approval procedure was warranted during the first couple of years of the charter tour rules, and so a "prior approval" procedure was put in place in January 1967, which by its terms was to lapse on January 1, 1968. *See* Supplemental Air Service Proceeding, *supra,* 45 C.A.B. Reports at 263, 292–294. (37810 Requirement of Statement of Authorization). This prior approval procedure was subsequently extended to January 1, 1969, and then in 1969 it was eliminated. *See* Amendments to Part 378, 34 Fed.Reg. 11263 (July 4, 1969)

---

**33.** Consistent with their apparent efforts to search out and locate the frontiers of avid advocacy, these defendants have never mentioned, discussed or disclosed to the court anything about this case or the contents of its closed file, except to argue that the case did not pierce the corporate veil. The CAB has also failed to discuss this case.

**34.** This argument may be properly classified as a "primary jurisdiction" argument. This is the way some cases on which Nationwide relies classified the question. *See* cases cited at Nationwide Mem. at 13. Of course, the appropriate court action when a primary jurisdiction defense is accepted is, except in unusual circumstances, *see Tishman & Lipp, Inc. v. Delta*

*Airlines,* 413 F.2d 1401, 1402 (2d Cir.1969), remand to the agency. Nationwide and Fidelity (which made this argument to Judge Conner and sought § 1292 certification) have not mentioned the need for remand, possibly because they know very well what was and is the CAB view on this matter.

**35.** *See also Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 100 S.Ct. 790, 63 L.Ed.2d 22 (1980); *Bowles v. Seminole Rock Co.,* 325 U.S. 410, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945) (cited by Nationwide).

**36.** *See* United States May Mem. at p. 9.

(Editorial changes made "to delete references to the expired statement of authorization procedures"). *See also* Notice of Proposed Rulemaking, *supra,* 34 Fed.Reg. at 10,001 & n. 2 (1969) (amendments to Part 378 will reflect that a statement of authorization no longer required). The focus of this eliminated procedure was less on the content of advertising and contracts than it was on the financial viability of the tour operator and the impact of the tours on scheduled traffic; the dawn of consumer protection had not yet broken over the charter tour industry. After this procedure was eliminated, however, it was no longer necessary for operators to obtain express approval in advance of each tour; it was only necessary that a prospectus be on file sixty days before each tour. 34 Fed.Reg., *supra,* at 11263.

Thereafter, regulations were effected that required filing of the tour prospectus fifteen days before advertising could begin. The purpose of this requirement was to permit monitoring by the CAB staff[37] of tour prospectus filings "for the protection of the public". Proposed Rule, 38 Fed.Reg. 30281 (1973) (later adopted). But the effect of this monitoring procedure was emphatically not to endorse or approve the content of tour participant contracts or advertising; not only was the concern of the staff focused on other aspects of the filings, but the staff was not delegated authority to approve or endorse prospectus filings: its authority extended only to "reject[ing]" or "accept[ing]" filings. *See, e.g.,* 14 C.F.R. § 385.13(hh) (1975); 14 C.F.R. § 385.13(ff) (1977).[38]

Accepting was not the same as "approving". *See generally* 14 C.F.R. § 385 (1975) (1977). When the CAB wanted to require specific approval it did so. *See id.;* Proposed Rule for Special Event Charters, 40 Fed.Reg. at 18001 (1975) (proposing to "mandate[ ] that no charter for special events be operated unless specific approval

is first obtained from the Board in the form of a Statement of Authorization"[39]). Indeed, a separate, specific mechanism was set up for operators who desired to obtain "approval" of their contracts and brochures. Under this mechanism, tour operators could submit "master" contracts and forms and request a staff opinion of approval. This mechanism was established when Part 378a was finalized. *See,* One Stop Inclusive Charter Tours, 34 Fed.Reg. 34089, 34099 (1975):

> We are agreeable to the suggestion made by United, Quebecair, ASTA and the Incentive Companies, that carriers and tour operators be allowed to submit standard contract forms for Board approval, thus assuring the technical compliance of such forms with the regulations. Once approved, the form contract may be used for repeated filings, as long as the governing regulations and other circumstances remain unchanged.

This was a mechanism apart from the prospectus filing procedures, and even this mechanism did not offer a completely safe harbor to tour operators. Not only did the enforcement staff have separate authority over prospectus items, but

> . approval by the Board's staff of a charter document form will not bind the Board itself from subsequently reviewing the staff action, either at the time of the first use of the documents or at any subsequent time.

*Id.* at n. 45. Nationwide has never suggested that it took advantage of this mechanism, the only means by which any sort of "approval" could attach to its contracts.

Nationwide, Graff and Nadel were certainly well aware that their practice of making itinerary changes but keeping all the money was never "approved" by anyone. Not only would any reasonable reading of the regulations intended for the benefit of tour participants have led to this

---

**37.** Specifically, the Bureau of Operating Rights.

**38.** Moreover, as shown *infra,* it was not incumbent on the board's staff to exercise this authority with respect to every filing.

**39.** It will be recalled that the § 378 "Statement of Authorization" requirement was eliminated in 1969.

conclusion, but two other events clearly demonstrate that these defendants had a contemporaneous understanding that the CAB was not endorsing their contracts or policies. First, these defendants, through counsel, are previously on the record as stating that not only did the CAB not "approve" anything in prospectus packages during the relevant periods, but that, during the relevant periods, the CAB staff did not even exercise its authority to "accept" prospectus filings. *See Nationwide Leisure Corp. v. CAB,* No. 78–1119 (D.C.Cir.1978), Reply of Petitioner and Movant Nationwide Leisure Corp.:

> No affirmative "acceptance" by the CAB staff is necessary for a prospectus to become effective.
>
> *   *   *   *   *   *
>
> Thus, a prospectus is effective after 15 days without affirmative Board action, unless the Board rejects it within that time. Moreover, the CAB staff has announced that it no longer examines every prospectus thoroughly, but "spot-checks." (See CAB Announcement attached.)

*Id.* at p. 7. The CAB announcement, made in the early part of 1977 by the Bureau of Operating Rights, states:

> "the number of charter filings . . . has gone beyond the level which we can [thoroughly review] . . . [W]e have recently instituted a policy which calls for a thorough review of only some filings . . . and a spot check of the remainder."

*Id.* (exhibit). The announcement then went on to recommend use of CAB-developed standard form contracts or use of the separate approval procedure discussed, *supra,* at pp. 972–973. These defendants failed to direct the courts attention on this motion to these prior admissions,[40] which demonstrate that their position now is just the opposite of the position they took nearer in time to the events at issue. They were right then and they are wrong now.

Secondly, while it is arguably true that the flurry of CAB activity with regard to Parts 378 and 378a may have been somewhat confusing,[41] the CAB clearly communicated its thoughts on these defendants' contracts and practices by suing these defendants in 1974. And arguments such as those relied on here by defendants have no application "when the agency has already said what it thinks about this exculpatory [clause]." *Klicker, supra,* 563 F.2d at 1313.

In conclusion, no exculpatory language in the tour participant agreements is a defense to the class cross-claims. It does not appear that the contracts purport to disclaim liability for itinerary changes, but assuming they do, such disclaimer is wholly inconsistent with the regulations governing the contract and is legally insufficient as a defense to the cross-claims.

## CONCLUSION

For the reasons given, the Classes' Motion to hold Capitol in Default must be DENIED, but Capitol is clearly a party herein and must answer the pending discovery demands within thirty (30) days. The Classes' Motion to Strike Fidelity's Second Defense must be GRANTED. The Classes' Motion to Strike Certain Defenses of Nationwide, Graff and Nadel must be GRANTED with respect to the Disclaimer Defense and DENIED (without prejudice to renewal on a proper record) as to the personal liability of Graff and Nadel.

———————

Pursuant to 28 U.S.C. § 636, as amended, the parties shall have ten (10) days within which to file written objections to the foregoing Recommended Decisions with the Honorable William C. Conner. Such submissions should be filed with the Clerk of Court, with extra copies delivered to the Chambers of Judge Conner, Room 608, and

---

**40.** The brief and exhibit thereto were, however, buried in a telephone book-size set of exhibits submitted on an earlier motion.

**41.** Also, during the seventies, CAB attorneys sometimes described the prospectus filing re-

quirements with respect to items *other than* tour participant contracts as an "approval" procedure. *See* Brief of CAB in *Nationwide Leisure Corp. v. CAB, supra.*

the Chambers of the undersigned, Room 431.

DATED: New York, New York
         September 13, 1982